Good morning. Good morning, Your Honor. May it please the Court, I'm Patrick Deaton. I represent Duanna Knighton in this appeal. We're here on an appeal from a motion to dismiss, which I believe, more akin, was closer to a court trial than a motion to dismiss. At the motion to dismiss phase, we should be accepting as true the allegations as pled in the complaint and construing the allegations liberally in favor of the non-moving party, which in this case was Ms. Knighton. And that's where I see some error in the district court's ruling in construing what the facts were and the evidence presented in the 12B motion. With respect, you're really talking about some unusual issues here in terms of the formation of a court, whether she was on tribal land, which cases applied. Those are all legal points, are they not, really having little to do with the factual allegations here? Well, I think it's all intertwined, Your Honor. And because, yes, the jurisdiction is a legal issue, but you have to look at the underlying facts to determine do those facts warrant jurisdiction. Let me just ask you this, in short. She obviously, when she was the administrator, she worked on the main reservation land, right? That is correct. And when she was doing administrative work, she worked in the building, I forget the name of the town, but she was involved in the purchase of it, and she worked there, too, right? That is correct, Your Honor. And that's also part of Indian land. The reservation, yes. Right. The tribal office in Alturas was not on the reservation. No, I understand that, but it was owned by the tribe, right? It was owned in fee by the tribe after 2009. Okay. Correct. So when we're looking at tribal court jurisdiction, there's two components. You can't have jurisdiction without having both regulatory and adjudicative jurisdiction, authority. And what we know from these Supreme Court cases is even if there is some measure of jurisdiction, its adjudicative powers cannot exceed the regulatory powers. And that's why it's important to look at the facts of the underlying case. Where do you get that from? I'm sorry? What case says that? That's Strott v. Awin Constructors. And that citation is specifically at page 453 where it says, even where a tribal court has jurisdiction, its adjudicative powers cannot exceed regulatory authority. Well, that doesn't get you very far, though. It doesn't get you very far. Well, and that's why we look at the underlying regulatory authority. What authority did the tribe have at the time my client was employed by the tribe? The authority it had was delineated in its personnel policies. It was delineated in its constitution and bylaws. Nowhere in the constitution and bylaws is there any sort of civil authority over any sort of tort measure. In the guidelines for the personnel policies, there is a very limited regulatory authority over employees. There's an expansive authority over its members because that's how they govern their members. But with respect to employees, it's very limited to key factors of discipline, that if there is some sort of discipline that should be measured. And in the record, the measures of disciplinary action are limited to five distinct options. A verbal warning, written reprimand, suspended without pay, demotion, or involuntary termination. Now, in March of 2013, Ms. Nightingham resigned. None of those options were on the table at that point going forward. It was in December of 2013 when the tribe first enacts its judicial code, where it first enacts some sort of civil authority to have jurisdiction or authority over nonmembers, including employees, for torts, for breach of contract, for the things that they allege in this complaint. But before December 2013, that simply did not exist. What about the Smith v. Salish Kootenai College case? That case indicated, and I'm quoting a little bit here, if there's conduct that's related to tribal land, that there is jurisdiction. In this case, as the administrator, indeed, one of the allegations is that she got a piece of the action in connection with the purchase of the land where the headquarters was. She worked there and so on. She was clearly involved with the tribal land all along. So doesn't that give them jurisdiction? Some measure of jurisdiction. And in this case, we have to determine on these facts what measure of jurisdiction in this case. And when we look at, we take Waterwheel, for example. Waterwheel is the case that the district court relied upon. And whether we take Waterwheel or Montana, my analysis would be the same. You're talking about that in terms of the inherent powers of the tribe? Correct. The inherent powers of the tribe are not unlimited. I think that's universally understood in every circuit. But here you're talking about allegations of theft and self-dealing. That's not much of a stretch, is it? I think almost any organization needs to protect itself from that kind of thing. It's not like you're inventing some wild new tort that nobody's ever heard of. I would agree with you, Your Honor. So the question is, is where can they vindicate that right? And that question, I think, is resolved in Waterwheel at page 817 where it says, the Supreme Court has indicated that tribal jurisdiction depends on what non-Indians reasonably should anticipate from their dealings with a tribe or tribal members on a reservation. And she falls right into it. I mean, here she's worked for years with the tribe. She probably wrote some of the regulations she violated. She couldn't be much more intermeshed with the tribe unless she was a member. But the question is, is what could she reasonably anticipate would be the remedy or the procedure that the tribe would follow? And in this case, no tribal court existed. There were no measures for the tribe to exercise that jurisdiction internally. She could reasonably anticipate being hailed into state court or federal court on those types of allegations. I agree with that. But there was no reasonable anticipation of being hailed into a court that didn't exist. Well, the tribe existed. The court is the mechanism by which the tribe carried out its inherent authority, right? I would agree with that. But the tribe still needs a mechanism to carry out that authority. That's what they did. They formed the tribal court and the court of appeal. And they're carrying out tribal authority greatly in expanse and seeking remedies that did not exist. Before the tribal court's existence, there was no measure of obtaining monetary damages, punitive damages, or any injunctive relief. The tribal council before December of 2013 did not have that authority. Well, fortunately, we have a colleague here from South Dakota who is expert on all such things. We're glad he's on our panel. He can respond to all of this. Well, and there's a case, Attorney Process and Investigative Services v. SAC and Fox Tribe, like sites of two councils, 619, Fed 3rd, 927, 2010. And the Eighth Circuit was considering a similar point. There, there was a 2003, a cause of action arose. 2004, the tribal court was established. And in 2005, the action there was brought in tribal court. That had to do with a casino and an uproar that arose and assaults on people and so on. But anyway, there was an outside outfit that was sued as a result of this. And the Eighth Circuit went on to say this point is illustrated by API. That's the outside outfit. Implicit concessions of the tribe might have jurisdiction in this case if only it had written regulations which specifically prohibited hijacking the casino, interfering with elections, and deposing the tribe's governing council. We need not pause, the court said, we need not pause to consider how foreseeable such conduct would have been because absence of such regulation is irrelevant in the factual context of the case. If the tribe retains the power under Montana to regulate such conduct, we would fail to see how it makes any difference, whether it does so through precisely tailored regulations or through tort claims such as those at issue here. Thank you, Your Honor. Unfortunately, I don't know the facts of that case inside and out. I know it's a gaming case, and so I presume there was some regulatory authority that they had in place. I can't commit to that, but my presumption is that if they had a casino in place, they had operating procedures. Here we have operating procedures that are very distinct in nature for personnel policies that limit any sort of remedies to those five scenarios that I've already outlined. I would like to reserve the remainder of my time. Unless there are any other questions. No, no, no. You're welcome to do that. Thank you, Your Honor. Good morning, Your Honors. Good morning. May it please the Court. Jack Duran, General Counsel to Cedarville Rancheria Tribal Court and also Judge Patricia Lindsay. Your Honors, when you apply the facts of established federal Indian law or actually the law to the facts of this particular case, jurisdiction can be found under any test that you apply. Irrespective of whether you call it consent, irrespective of whether you call it special effects, inherent authority or water wheels, land-based analysis, we can find jurisdiction under any of those tests. And it is unquestionable that the tribe requests the district court opinion to be upheld by this particular court. Starting off with the Strade case, if we understand the application of Montana in that particular instance, jurisdiction was not found in the Strade case because the road upon which the accident occurred that ran through the reservation was controlled by the state, and the tribe had no gatekeeper responsibilities over that road. However, in McDonald, a completely different situation involving a BIA road, jurisdiction was held over those defendants for merely traveling on the road and having that accident. Here we have a complete different facts with regards to Ms. Knighton, where she had that 15-year relationship both on and off the reservation that touched every facet of the tribe's lives, most importantly its land. She dealt with EPA grants. She dealt with the tribe's finances. She dealt with the tribe's housing funds. She actually used a portion of the housing funds that she received from the government to pay herself in excess of hundreds of thousands of dollars for a 12-member tribe in Modoc, California, one of the most impoverished places in the state of California. Now, under the tribe's inherent authority, setting aside Montana, the tribe could, under established law, under both the Marin case and under Salt River, in those particular cases we had tribes that had entered into contracts with existing vendors. And later on, one tribe in Marin decided to establish a taxing ordinance, and the other tribe in Salt River decided to put an employment ordinance in place. After having and establishing that relationship, the court in both of those cases upheld the tribe's inherent authority to apply those particular ordinances and grant the tribe's authority to establish both the tax increase and establish both the employment ordinance. Now, here. Let me ask you this. Yes, Your Honor. One thing that has troubled me a little bit, if we're talking about civil actions, that's pretty clear. But in this case, you really got criminal complaints effectively. Does that make any difference in terms of what rights Ms. Knighton might have? Well, I think in a criminal context it would, because under PL-280, we know that the state of California would be able to have jurisdiction over those particular claims here. But we're talking civil claims. No, I understand that. Yeah. But I don't know that it makes a difference necessarily, but if you have a court of record that makes certain findings that are very clearly also criminal violations, does that make a difference? In certain cases it might make a difference, but in this particular case it wouldn't. Because the tribe is not charged or criminally. Exactly. Right, right. Now, with regards to inherent authority also, we were talking, opposing counsel was talking about these administrative procedures. All right. The administrative procedures that Ms. Knighton, you know, was using did not exist before Ms. Knighton worked for the tribe. So by actually imposing those administrative procedures on the tribe, she has already demonstrated the inherent authority for the tribe to create processes and procedures over its own employees without having to consent to them. So if the tribe can implement these administrative procedures, which held her responsible to the tribal counsel. Let me ask a related question. Assuming the correctness of what you just said, that the tribe has that inherent authority, what about this issue of, you know, sort of like retroactive application? I mean, you know, these, I'll call them, you know, they're not regulations, but I'll call them regulations, were not created until after she finished her employment, right? And the court was even in existence at the time of her employment. It wasn't created until well after she left any relationship with the tribe. What about all this retroactive application? Absolutely, Your Honor. Basically, and this was brought out in the Marin case, there was also an ex post facto argument made in that particular case about the retroactivity of the tax ordinance upon the Marin vendors. And the court said no, at the original point in which the relationship started with the tribe, the tribe always had the authority to establish a tax ordinance at any time. Now, in this particular case, what the guidance that the administrative procedures give us is that the tribe, in actuality, could have created a court, could have, and that court could have been either the executive council or the tribal general council. They could have convened a court. They could have had a trial. They could have, and if she was found guilty of those civil charges and damages were awarded, they could have issued a damage award. The tribe could have then taken that award under the 2002 or 2012 tribal money judgments statute in the state of California, converted that award judgment into a California state enforceable superior court judgment, and enforced it against Mrs. Knighton. So the tribe had the same powers. It just decided to utilize a court as opposed to the general council or its executive council. Now, when you look at it in that context, where is she getting more substantial justice, from an independent member of the judiciary that works for the tribe or having to actually face the tribe's governing body and its membership for which she committed, you know, these unspeakable things? Do you have a case that says what you just did? In other words, that the executive council or the general council could have been the entity that tried her for these very same things. They could have taken any resultant judgment and under federal law or state law applied those judgments, gotten the benefit of California courts and others to enforce the judgment. I don't have a case that's on point, Your Honor, but I have seen tribal judgments converted under the Uniform Monetary Judgments Acts across the United States. But you're reaching for more than you need in order to win this case. I'm just giving an example of how this could happen. But what I am saying is that the tribe has the inherent authority to have created and convened a court at any time, and that what she is being asked to compel to, the tribe could have taken care of via its own processes without a court, which it actually did when it was utilized to take when Ms. Knighton discharged members of her staff, when Ms. Knighton assisted the tribe to disenroll half the tribe's membership in 2008. She knows exactly what the powers of the tribe were. So you're saying basically she got a better, if you will, due process having this occur through the tribal court than through, say, the executive council. Exactly. And I'll say one other thing. What we're not saying, Your Honors, is that there isn't concurrent jurisdiction outside the tribe in state or federal court. But what we are saying is the tribe can't be forced to go to those forums if it decides to utilize its sovereignty in its own court. Does your tribe use an appellate court in conjunction with some other tribes? How does that work? Yes, exactly. What happened in this particular case, Your Honor, is after the lower court handled the case, it went to a three-judge panel. Similar to what we are experiencing here, they made a decision. They upheld the lower court's findings. And then at that point it transferred over pursuant to the stipulation the tribe stipulated with Mr. Deaton or with Mrs. Knighton to go ahead and allow the jurisdictional question to come before the district court. Okay. Unless there are any questions? Other questions? I submit to the court. Thank you. We have a little rebuttal time, counsel. And just two real quick points here, and I think Your Honor touched on it already. Is there any case on point that allows the court or allows the tribe to sua sponte, create a court? And I haven't been able to find that case. And when we look in the record case that he cited. I misspoke. In the record of this case, there is nowhere in the record that allowed this proceeding to take place here. We have a record that established personnel policies, and that's it. And I would agree with the comment that was made that it probably is a better process to go to the tribal court than to be held accountable or have a case tried in front of the tribal council. But it's also a better process for a United States citizen to be held in a state court or in a federal court that is open to the public where her rights to a jury in a civil authority case or civil case, tort matter, is upheld as well. With that, Your Honors, I would submit. Thank you both for your argument. The case just argued is submitted.
judges: Tashima, M. Smith, Piersol